STATE EMPLOYMENT RELATIONS BOARD, Appellee,

v.

PIERCE TOWNSHIP, Appellant.

[Cite as *State Emp. Relations Bd. v. Pierce Twp.*, 155 Ohio App.3d 68, 2003-Ohio-5433.]

Court of Appeals of Ohio,
Twelfth District, Clermont County.

No. CA2002–11–093.

Decided Oct. 13, 2003.

Jim Petro, Attorney General, and Michael D. Allen, Assistant Attorney General; and Livorno & Arnett Co., L.P.A., and Henry A. Arnett, for appellee.

Mason Law Firm Co., L.P.A., Ronald L. Mason and Kevin E. Vance, for appellant.

_____

VALEN, Presiding Judge.

{¶ 1} Appellant, Pierce Township, Clermont County, Ohio, appeals from a decision of the Clermont County Court of Common Pleas that substantial evidence supported the determination by appellee, the State Employment Relations Board ("SERB"), that Pierce Township had engaged in unfair labor practice ("ULP") with regard to five of its employees. We affirm the common pleas court's decision.

{¶ 2} Pierce Township is a public employee subject to R.C. Chapter 4117. Historically, the township maintained a volunteer fire department. It also maintained a service department, which consisted of two divisions: the roads and bridges division and the buildings and grounds division. The buildings and grounds division had five employees: Dene Riggenbach, Faith Doty, Joseph Tvrdy, Mark McDowell, and Scott Light. In the 1990s, these five employees had been hired to provide daytime coverage for the fire department, as it was difficult to obtain volunteer coverage during these hours. All five employees had either received emergency medical training ("EMT"), advanced EMT, or firefighting training when they were hired or agreed to obtain any required certification as a condition of their continued employment. The township paid for paramedic and firefighting training for some of the five employees while they were employed by the township.

{¶ 3} All five employees worked full-time, were paid hourly, and accrued sick pay, vacation pay, and holiday pay. Their titles included "full-time fireman/EMT and maintenance worker," "Fireman, E.M.T. and Maintenance Department Employee," "full-time EMT/maintenance personnel," "EMT/maintenance worker/ground crew," "emergency medical technician/fire fighter and service department employee," and "EMT/maintenance personnel." Their workdays would begin at the township fire department, checking the township life squads to make sure they were stocked and in working order. While on standby for fire and emergency medical services ("EMS") runs, they performed other duties both inside and outside the fire department, including cleaning and maintenance of buildings and grounds, lawn mowing, and cemetery work.

{¶ 4} On July 7, 2000, the Pierce Township Professional Fire Fighters, IAFF Local 4061 ("Local 4061"), filed a petition for a representation election with SERB. Local 4061 sought to represent a proposed bargaining unit of captains, lieutenants, fire fighters, emergency medical technicians, and paramedics. The proposed unit consisted of the five employees of the buildings and grounds

division. On December 12, 2000, the township eliminated the positions of the proposed bargaining-unit members by terminating Riggenbach, Doty, and Tvrdy, by transferring McDowell to the roads and bridges division, and by promoting Light to a new EMS program. Consequently, Local 4061 and Riggenbach filed ULP charges against Pierce Township, alleging that the township had violated R.C. 4117.11(A)(1) through (4) and 4117.11(A)(7) by (1) unilaterally changing the proposed bargaining-unit members' uniforms, work schedule, lunch compensation, and calculation of holiday pay while the petition for election was pending, and (2) terminating all five proposed bargaining-unit members while the petition for election was pending.

{¶ 5} SERB consolidated the charges, determined that there was probable cause to believe that the township had violated R.C. 4117.11(A)(1) through (3), and held an administrative hearing on the charges. The hearing revealed the following additional facts:

{¶ 6} In January 2000, Pierce Township hired Thomas Behymer as administrator. Behymer had previously served as the township clerk for over 20 years and as the director of zoning and planning for two years. At his request, in February 2000, the township hired David Coyle as director of zoning, planning, and engineering. Together, both men were to improve the efficiency of the service department. The first change occurred in April 2000 when both divisions of the service department were placed under Coyle's supervision (instead of each reporting to a different person).

{¶ 7} According to both men, Behymer and Coyle started talking about outsourcing some of the operations performed by the service department around April or May 2000. Behymer and township trustee Curt Hartman testified that they personally talked about outsourcing in late April. Hartman believed outsourcing was first discussed at a trustees' meeting in May. Township trustee Bonnie Batchler testified that the idea of looking into outsourcing was brought to everyone's attention in early May. Batchler did not recall discussing outsourcing outside of trustees' meetings. Yet the minutes of the trustees' meetings either in May 2000 or before December 12, 2000, when Coyle made a presentation to the trustees about outsourcing, lack any reference to the issue. Hartman testified that he thought that outsourcing was discussed during an executive session of the trustees on May 9, 2000. Coyle was subsequently asked to prepare an outsourcing study.

{¶ 8} According to Behymer and Coyle, both men had a meeting on May 12, 2000, with Light and Darrell Berry, then the supervisors of the buildings and grounds division and the roads and bridges division respectively, during which they advised both supervisors that they were looking into outsourcing. Although Light testified as a witness for the township, the township did not ask him one

question to confirm that the May meeting took place or that outsourcing was discussed. Subsequent to the meeting, other changes made in the spring of 2000 to improve the service department included replacing Light as supervisor of the buildings and grounds division by Wayne Spiegel. Light, however, continued to work for the division.

{¶ 9} In May 2000, Robert Connell, then the township fire chief, submitted a five-year plan to the trustees regarding the goals and future of the fire department. The plan, later changed to a ten-year plan, was again submitted to the trustees in July and August 2000. No terminations or layoffs were envisioned. Instead, the plan called for the continued employment of the proposed bargaining-unit members and for the hiring of part-time people to assist with EMS and fire response on weekends and evenings. Connell resigned in September 2000 at the suggestion of Hartman. Although outsourcing the service department potentially affected the fire department (by affecting the positions of the proposed bargaining-unit members), Coyle never consulted Connell about the study and never asked for his input.

{¶ 10} As previously noted, Local 4061 filed the petition on July 7, 2000, seeking to represent the five proposed bargaining-unit members. It is undisputed that the township did not become aware of the unionizing efforts until it received the petition early in July 2000. Subsequently, the township made the following changes to the service department:

{¶ 11} Before the petition was filed, the proposed bargaining-unit members wore a uniform consisting of blue pants, T-shirt, sweatshirt, and jacket. Printed on the uniforms were logos that read, "Pierce Township Fire Department, EMS." On August 10, 2000, without prior notification or discussion, the township issued a memorandum informing the proposed bargaining-unit members that they were no longer to wear the fire department uniforms. Instead, they were issued brown pants and orange shirts, the same uniform worn by the township's road crew employees. Coyle and/or Behymer asserted that the uniform change was for safety reasons (because the foregoing members were spending much time cutting grass along the roads), and to increase efficiency (by having all employees of the service department dressed alike). Following the uniform change, the proposed bargaining-unit members continued to make fire and EMS runs.

{¶ 12} Before the petition was filed, the proposed bargaining-unit members worked four ten-hour days each week and had done so since December 1998. This schedule had been implemented in part to eliminate the need to pay overtime between 4:00 p.m. and 6:00 p.m. while improving response time. Riggenbach testified that under the old schedule, there were always at least three persons working and that they were on standby from 4 a.m. until they started their shift. On September 26, 2000, without prior notification or discussion, the

township posted a memorandum changing the work schedule of the proposed bargaining-unit members to five eight-hour days per week. A team of three members was to work from 8:00 a.m. to 4:30 p.m.; a second team of two members was to work from 9:30 a.m. to 6:00 p.m. The memorandum further stated that "team members, who are assigned a time slot, will continue covering the 4:00 a.m. to 6:00 p.m. time slot during weekdays. Time and one-half or compensatory time will be paid for emergency responses during this period. A team member may be asked to come in to work earlier or later to keep the life squad or fire trucks in service. Overtime will be paid provided Dave Coyle has approved it in advance of its use."

{¶ 13} Before the petition was filed, the proposed bargaining-unit members were paid for their half-hour lunch break as they were required to be available in the event of a fire or EMS run. On October 3, 2000, without prior notification or discussion, the township posted a memorandum informing the foregoing members that they were no longer to be paid for their lunch break.

{¶ 14} Before the petition was filed, the proposed bargaining-unit members received holiday pay and overtime pay at the rate of time and one-half if they worked on a holiday. In November 2000, the township began paying them holiday pay and straight-time pay instead of overtime when they worked on holidays.

{¶ 15} While recognizing that the foregoing changes were made after the petition was filed, Coyle, Behymer, and Hartman denied that the changes were motivated by the proposed bargaining-unit members' unionizing efforts. Hartman asserted that the changes were made simply to increase the efficiency of the township's operations. Hartman did state, however, that the trustees viewed the union petition as presenting "the prospects of imminent court action." Behymer denied that the changes affected only the proposed bargaining-unit members. Instead, he asserted that the changes affected the entire service department. Coyle testified that he was not going to let a unionizing effort get in the way of the outsourcing study. Coyle then explained that the unionizing effort did not play a part in his study. Connell testified that a few weeks after the petition was filed, he met with Behymer, Coyle, and another person. Connell testified that the township officials did not want the union and that they were not to talk about it to anybody.

{¶ 16} In November 2000, a 2.9 mill township fire/EMS levy was passed. According to the campaign literature, the purpose of the levy was to "complement the services of the volunteers, as well as to continue to provide quality services to the community." According to the same literature, the goals of the township trustees were to "improve the response time for EMS runs by implementing a paramedic program to man the main station 24 hours a day, 7 days a week to

complement the volunteer force," and to "upgrade the emergency equipment of the fire and EMS department."

{¶ 17} In the fall of 2000, the township published a newspaper advertisement seeking to hire part-time paramedics and/or part-time paramedics/fire fighters to supplement its volunteers. Only certified paramedics or paramedics/fire fighters were to apply. The record shows that at the time of their termination, Riggenbach and Tvrdy were both certified paramedics and both had the highest certification one could have as a fire fighter. Their training to become paramedics had been paid by the township while they worked for the township.

{¶ 18} On December 12, 2000, during a trustees' meeting, Coyle presented a "Report on Contracting For Services." This was the first time the trustees saw the presentation and the study on outsourcing. Although Behymer and Coyle had originally talked about outsourcing some of the operations performed by the service department, the report focused solely on the buildings and grounds division, did not affect the three employees of the roads and bridges division, and addressed only the costs associated with the maintenance functions (such as cleaning, mowing, burials) performed by the proposed bargaining-unit members. The report did not address the fire/EMS functions performed by the proposed bargaining-unit members. Tvrdy, who was at the meeting at Light's suggestion, testified that the presentation focused only on the outsourcing of maintenance duties. "Nothing was mentioned about fire and E.M.S."

{¶ 19} Tvrdy also testified that during the trustees' meeting, it was presented that the proposed bargaining-unit members were doing strictly maintenance duties, that those duties were not associated with the fire department, and that fire/EMS runs were only a small part of what they did. While actual fire/EMS runs were a small part of their duties, the proposed bargaining-unit members testified that about half of their time was spent on fire/EMS activities. Time sheets for 1999 show that 55 percent of Tvrdy's regular time and 52 percent of his overtime, 58 percent of Riggenbach's regular time and 48 percent of his overtime, 55 percent of Light's regular time and 95 percent of his overtime, and 49 percent of Doty's regular time and 85 percent of her overtime were allocated to the fire department. The discrepancy between the proposed bargaining-unit members' time sheets and the report is based upon what is included in fire activities. While Coyle considered activities such as cleaning and maintaining fire/EMS equipment to be maintenance activities, the proposed bargaining-unit members included them in fire/EMS activities.

{¶ 20} The report concluded that by eliminating the buildings and grounds division, by outsourcing most of the division functions, and by paying an employee $50,000 a year to perform functions that could not be outsourced (burial-traffic control, cemetery foundation, and cemetery grass cutting), the township would

save over $195,000 per year. Following Coyle's presentation, the township voted to eliminate the buildings and grounds division and terminated Doty, Tvrdy, and Riggenbach, President of Local 4061. Riggenbach found out about his termination by receiving a phone call from Tvrdy. Riggenbach and Doty testified that the only explanation they were given as to why they were terminated was that the township was outsourcing and eliminating the maintenance functions. As previously noted, Light was promoted to manager of the township's EMS Operations. McDowell was transferred to the roads and bridges division. When he showed up for work the next day, the supervisor of the division had no idea what had taken place or why McDowell was there.

{¶ 21} Township trustee Batchler testified that the township's paramedic program, for which the levy was passed, took effect July 1, 2001. Yet minutes of a trustees' meeting on January 9, 2001, show that on that particular day, the township hired five persons for the township's fire/EMS department, hired 15 part-time paramedics, and compensated several persons for work they had done as part-time paramedics/fire fighters during December 2000 and January 2001.

{¶ 22} On September 24, 2001, an administrative law judge ("ALJ") issued a proposed order, which included findings of fact and conclusions of law, determining that the township had violated R.C. 4117.11(A)(1) through (3). In particular, the ALJ found the following:

{¶ 23} "The culmination of the Township's response to the proposed bargaining-unit members' petition occurred on December 12, 2000, when it was able to halt the representation process entirely by decimating the proposed bargaining unit. The Township abruptly terminated, without notice, the employment of the President of Local 4061, Mr. Riggenbach, and the employment of Ms. Doty and Mr. Tvrdy. The Township never met with or provided a written or verbal explanation for their terminations to these individuals. The terminations of the employment of three of the five proposed bargaining-unit members within days of the dates SERB had scheduled for prehearing and hearing on the petition, constitutes an adverse action against these employees under circumstances creating a reasonable inference that the Township's actions were related to the employees' exercise of activity under [R.C.] Chapter 4117."

{¶ 24} The ALJ also rejected the township's defense that the several changes it had made to the proposed bargaining-unit members' terms and conditions of employment were a result of its desire to streamline and enhance the efficiency of its service department:

{¶ 25} "The Township was unable to provide any documentation to show that contracting out was a serious possibility or under serious consideration before the petition was filed. The minutes of the trustees' meetings before December 2000 lack any reference to the issue, and no reports, working papers, or other

documents exist to show that the Township was working on an outsourcing study at any time before December 12, 2000, when Mr. Coyle made a presentation to the trustees and the trustees voted to eliminate the proposed bargaining-unit members' positions that same day.

{¶ 26} "* * * [T]he Township put forth no documentation other than the undated, computer-generated PowerPoint 'report' [of Mr. Coyle] as the basis for the trustees voting to make the aforementioned personnel changes. The 'report' is little more than a brief outline. It is completely lacking in footnotes or other verifiable sources of the alleged cost-savings claimed by the Township to have been realized by 'outsourcing' the buildings and grounds work. Moreover, neither Mr. Coyle nor any other Township witness presented any other evidence, testimonial or documentary, of the calculations, estimates, or processes used to undertake and complete the 'report.' * * *

{¶ 27} "* * *

{¶ 28} "* * * The Township states that the changes were made as a result of the hiring of Mr. Coyle and Mr. Behymer, with the mandate to revitalize and make efficient the 'service department,' and not in response to the filing of the petition. But no changes were made until after the petition was filed, at which time they came in rapid succession, affecting each time only the five proposed bargaining-unit members. Moreover, no changes were made affecting the road crew, which comprises the remainder of the 'service department.'

{¶ 29} "* * * [T]he overwhelming weight of the evidence reveals that the proposed bargaining-unit members were more than maintenance workers. 'Outsourcing' maintenance work—even if the Township had offered credible evidence that it actually did do so—did not eliminate all of the work the proposed bargaining-unit members were hired to perform, and did perform, for the Township. The proposed bargaining-unit members did not simply 'volunteer' in the fire department: the documentary evidence in addition to the testimony of the proposed bargaining-unit members confirms that they were hired and paid to perform fire and EMS duties as well. * * * Thus, any determination by the Township to 'outsource' service department work does not rebut the inference that anti-union animus led to the termination of three of the proposed bargaining-unit members, particularly in this case when the Township was simultaneously expanding its fire and EMS operations and actively seeking and paying other individuals to perform fire and EMS duties."

{¶ 30} On December 6, 2001, SERB adopted the ALJ's proposed order in its entirety and ordered that four of the proposed bargaining-unit members be offered reinstatement to their former or comparable positions and be compensated for lost wages. Pierce Township appealed to the common pleas court.

{¶ 31} By decision filed October 10, 2002, the common pleas court upheld SERB's finding that the township had committed a ULP in violation of R.C. 4117.11(A)(1) and (3). Addressing the township's assertion that substantial changes in the service department occurred before the petition was filed (changes such as stopping the use of summer help, placing the entire service department under Coyle's supervision, demoting Light by replacing him with Spiegel, and announcing and instituting the investigation of outsourcing), the common pleas court found, "Although these examples serve as changes prior to July 2000 and may be evidence of outsourcing within the Service Department, they do not provide the requisite evidence needed to overcome the presumption of discrimination. [The township] fails to address the distinction between maintenance workers in the Service Department and the proposed bargaining-unit members who were also fire fighters and EMTs. * * * Therefore, any determination by the Township to 'outsource' Service Department work does not rebut the inference that anti-union animus led to the termination of three of the proposed bargaining-unit members and the subsequent demise of Local 4061, particularly when the Township was simultaneously expanding its fire and EMS operations. Giving both factual and legal deference to SERB, the SERB Order and Opinion are supported by substantial evidence on the record as a whole."

{¶ 32} Pierce Township moved the common pleas court to reconsider its opinion. By opinion filed November 15, 2002, the common pleas court overruled the township's motion. Pierce Township now appeals the common pleas court's October 10, 2002 decision and raises two assignments of error.

{¶ 33} In its first assignment of error, the township argues that the common pleas court erred by finding that substantial evidence in the record supported SERB's conclusion that the township had committed a ULP. In its second assignment of error, the township argues that the common pleas court erred by finding that substantial evidence in the record supported SERB's conclusion that the township had failed to rebut the presumption that its actions were motivated by antiunion animus. The township asserts that since (1) outsourcing was considered or instituted before the petition was filed, (2) outsourcing was continued after the petition was filed, and (3) the township did not know about the unionizing efforts when it started making changes, Local 4061 failed to establish that the township had committed a ULP. The township also asserts that the common pleas court failed to consider in both its decisions all of the township's rebuttal evidence, in particular the substantial savings resulting from outsourcing.

{¶ 34} We will not consider the common pleas court's decision denying the township's motion for reconsideration. It is well established that motions for reconsideration of a trial court's decision are a nullity with the enactment of the

Rules of Civil Procedure and are thus a legal fiction that may be ignored by the courts. See *Scottsdale Ins. Co. v. Brock* (Feb. 14, 2000), Butler App. Nos. CA99–01–009 and CA99–02–023, 2000 WL 189616. We will therefore consider only the court's October 10, 2002 decision.

{¶ 35} Pierce Township challenges the determination that it committed a ULP in violation of R.C. 4117.11(A)(1) and (3). These statutory provisions state:

{¶ 36} "(A) It is an unfair labor practice for a public employer, its agents, or representatives to:

{¶ 37} "(1) Interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Chapter 4117. of the Revised Code * * *;

{¶ 38} "* * *

{¶ 39} "(3) Discriminate in regard to hire or tenure of employment or any term or condition of employment on the basis of the exercise of rights guaranteed by Chapter 4117. of the Revised Code."

{¶ 40} A ULP occurs when an employer takes an action regarding an employee that is motivated by antiunion animus. *State Emp. Relations Bd. v. Adena Local School Dist. Bd. of Edn.* (1993), 66 Ohio St.3d 485, 497, 613 N.E.2d 605. The motivation behind an employer's decision to take an action regarding an employee is therefore the central question that must be resolved in a ULP case. Id. at 494, 613 N.E.2d 605. "Motivation is rarely clear. An employer charged with a ULP will almost always claim that the particular action was taken for sound business reasons, totally unrelated to the employee's participation in protected activities. * * * Since evidence of the employer's motivation is rarely direct, SERB must rely on a good deal of circumstantial evidence in arriving at its conclusion." Id. at 494–495, 613 N.E.2d 605.

{¶ 41} "[U]nder the 'in part' test to determine the actual motivation of an employer charged with a ULP, the proponent of the charge has the initial burden of showing that the action by the employer was taken to discriminate against the employee for the exercise of rights protected by R.C. Chapter 4117. Where the proponent meets this burden, a prima facie case is created which raises a presumption of antiunion animus. The employer is then given an opportunity to present evidence that its actions were the result of other conduct by the employee not related to protected activity, to rebut the presumption. SERB then determines, by a preponderance of the evidence, whether a ULP has occurred." Id. at 499, 613 N.E.2d 605. The issue of motive on the employer's part is a question of fact. As a fact-finder, SERB is in the best position to make this determination. *State Emp. Relations Bd. v. Wolf Creek Local School Dist.*

*Bd. of Edn.* (Mar. 26, 1991), Washington App. No. 90 CA 19, 1991 WL 43351, at * 2.

{¶ 42} When a common pleas court reviews a SERB order, the court must determine whether the order is supported by substantial evidence in the record. R.C. 4117.13(D); *Adena,* 66 Ohio St.3d at 491–492, 613 N.E.2d 605. In reviewing the order, the common pleas court must accord due deference to SERB's interpretation of R.C. Chapter 4117.

{¶ 43} In reviewing the same SERB order, an appellate court's role is more limited than that of a trial court reviewing the order. "It is incumbent on the trial court to examine the evidence. Such is not the charge of the appellate court. The appellate court is to determine only if the trial court has abused its discretion. An abuse of discretion ' * * * implies not merely error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency.' " *Lorain City School Dist. Bd. of Edn. v. State Emp. Relations Bd.* (1988), 40 Ohio St.3d 257, 261, 533 N.E.2d 264. Absent an abuse of discretion on the part of the common pleas court, a court of appeals must affirm the common pleas court's judgment. Id. "The fact that the court of appeals * * * might have arrived at a different conclusion than did the administrative agency is immaterial. Appellate courts must not substitute their judgment for those of an administrative agency or a trial court absent the approved criteria for doing so." Id. at 261, 533 N.E.2d 264.

{¶ 44} Pierce Township argues that the common pleas court erred by upholding SERB's order because the evidence in the record does not support a finding of ULP, but rather shows that the decision to eliminate the buildings and grounds division was solely taken for financial reasons. We disagree. Notwithstanding the township's argument to the contrary, substantial evidence does support SERB's finding that the elimination of the buildings and grounds division, which resulted in the elimination of all of the proposed bargaining-unit members' positions, was motivated by the members' union-organizing activity. While the township allegedly started to consider outsourcing to improve the efficiency of the *service department,* only the buildings and grounds division of the department was affected by the township's decision to outsource. With the exception of Spiegel, who was moved around by the township until he was demoted to supervisor of that division and ultimately fired for poor performance, the division consisted only of the five proposed bargaining-unit members.

{¶ 45} Pierce Township claims that the elimination of the division was taken solely for financial reasons and that it had made substantial changes to the service department before it learned of the unionizing efforts. Although there is some evidence that the township first started talking about outsourcing in the

spring of 2000 before the petition was filed, a reasonable inference can be drawn from the record as a whole that little action was taken about outsourcing until the township became aware of the petition. Pierce Township claims that it made substantial changes before the petition was filed, to wit, not hiring summer help for the service department, placing the service department under Coyle's supervision, and demoting Light from his supervisory position by replacing him with Spiegel. However, those changes did not affect the terms and conditions of employment of the proposed bargaining-unit members. The changes also affected the entire service department.

{¶ 46} By contrast, after the township became aware of the unionizing efforts, several substantial changes were made (uniforms, work schedules, lunch pay, and holiday pay). Those changes only affected the buildings and grounds division and systematically affected the terms and conditions of employment of the proposed bargaining-unit members. Those changes ultimately resulted in the elimination of the division within days of the dates SERB had scheduled for prehearing and hearing on the petition. In light of the evidence that the township was not happy about the unionizing efforts and that the issue was discussed on several occasions during executive sessions of the trustees, it is reasonable to conclude that the township was working as fast as it could to eliminate the division before a union could get off the ground.

{¶ 47} Pierce Township claimed that outsourcing the maintenance functions performed by the proposed bargaining-unit members resulted in substantial savings to the township. However, the only documentary evidence submitted by the township about those savings was the undated, computer-generated outsourcing report as presented to the trustees by Coyle on December 12, 2000, and as testified to by Coyle and Behymer. As the ALJ aptly stated, the report is completely lacking in any "verifiable sources of the alleged cost-savings. Moreover, neither Mr. Coyle nor any other Township witness presented any other evidence, testimonial or documentary, of the calculations, estimates, or processes used to undertake and complete the 'report.' " Nor were estimates or invoices from the alleged providers of the outsourced work provided. The in-part test gives an employer an opportunity to present "evidence that its actions were the *result of other conduct by the employee* not related to protected activity." (Emphasis added.) *Adena,* 66 Ohio St.3d at 499, 613 N.E.2d 605. There is no evidence in the record that the township's decision to eliminate the positions of the proposed bargaining-unit members was the result of any conduct by the employees other than their unionizing efforts.

{¶ 48} In addition, although the maintenance functions performed by the proposed bargaining-unit members were outsourced, that was not all of what they were hired to do and did for the township. All five proposed bargaining-unit

members were hired to provide daytime coverage for the fire department and had either EMT or firefighting training. At the time their positions were eliminated, the township was simultaneously expanding its fire and EMS operations, seeking to hire part-time paramedics and fire fighters, and paying other workers to perform fire and EMS duties. Before they were terminated, two of the proposed bargaining-unit members, Riggenbach and Tvrdy, had received their paramedic certification following a paramedic training paid by the township.

{¶ 49} In light of the foregoing, we cannot say that the common pleas court's decision to uphold SERB's ULP determination against Pierce Township amounted to "perversity of will, passion, prejudice, partiality, or moral delinquency." *Lorain,* 40 Ohio St.3d at 261, 533 N.E.2d 264. We therefore find that the common pleas court did not abuse its discretion in upholding SERB's order. Pierce Township's first and second assignments of error are overruled.

Judgment affirmed.

WILLIAM W. YOUNG and WALSH, JJ., concur.